Charles A. HOOD, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CO–1581.

District of Columbia Court of Appeals.

Argued Dec. 17, 2010.

Decided Sept. 15, 2011.

Sydney J. Hoffmann, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Mary B. McCord, and Sherri L. Berthrong, Assistant United States Attorneys, were on the brief, for appellee.

Daniel P. Westman and Jeremy Merkelson, Washington, DC, filed a brief of amicus curiae on behalf of the Mid–Atlantic Innocence Project and the Innocence Network.

Before GLICKMAN, Associate Judge, RUIZ, Associate Judge, Retired,* and NEBEKER, Senior Judge.

GLICKMAN, Associate Judge:

Appellant Charles A. Hood was tried by a jury and found guilty of first-degree felony murder and related offenses stemming from an attack on an elderly woman in her home on the morning of May 18, 1989. This court affirmed his convictions on direct appeal in an unpublished opinion. Appellant was sentenced to lengthy terms of imprisonment and remains incarcerated.

In September 2002, appellant filed a *pro se* motion to set aside his convictions pursuant to D.C.Code § 23–110 (2001). The trial court construed the motion as raising a claim for relief under the then recently enacted Innocence Protection Act of 2001 ("IPA"), D.C.Code § 22–4133 *et. seq.* (2010 Supp.). In the ensuing litigation over that claim, the government and appellant eventually agreed to DNA testing of physical evidence in the case—a knife and appellant's clothing—on which human blood had been found. This testing was inconclusive. Appellant then moved to have other items that had been recovered from the scene of the crime tested for the presence of DNA in any trace skin cells that might have been deposited on the items. In November 2008, the motion judge rejected this request and denied appellant's motion for a new trial. From those rulings, appellant noted this appeal. We conclude that appellant has not demonstrated his entitlement under the IPA to the additional DNA testing he seeks. Accordingly, we affirm the denial of relief.

I.

Appellant was convicted for attacking Ms. Helen Chappelle in her home shortly after midnight on May 18, 1989. Ms. Chappelle died from her injuries eleven days later. The 78–year–old victim lived on Decatur Street with her nephew, Edward Simms. Mr. Simms was not home at the time of the attack, but the incident was witnessed by two neighbors who happened to be sitting on a stoop across the street.

As they sat there talking, the neighbors—Ms. Arrington and Mr. Johnson—noticed Ms. Chappelle standing on her front porch. She was hollering that she was being robbed. This was not as disturbing as might be supposed, because it was something Ms. Chappelle, who suffered from dementia, did almost every night. Knowing this, and seeing that she appeared to be unharmed, Ms. Arrington and Mr. Johnson were not alarmed by her cries for help. After a while, they saw appellant and a female companion walking up the sidewalk in their direction. They overheard the woman tell appellant that people took Ms. Chappelle's hollering as a joke.[1] Then something unusual happened:

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

1. Bridgett Glover, who identified herself as

Appellant suddenly took off running across the street to Ms. Chappelle's house. Ms. Arrington and Mr. Johnson saw him run onto Ms. Chappelle's front porch, pass by Ms. Chappelle to enter the front door of her house, and run up the interior staircase to the second floor. After a few moments, Ms. Chappelle followed appellant inside. From across the street, Ms. Arrington and Mr. Johnson heard sounds of a struggle and Ms. Chappelle yelling. Her yells turned to what sounded like screams of pain, which continued for several minutes. Then there was silence.

Ms. Arrington called the police. Mr. Johnson kept watch on Ms. Chappelle's home until the police arrived a few minutes later. By then, appellant had been inside the house for a total of about fifteen or twenty minutes. During that time, Mr. Johnson saw no one else enter or leave the premises.

As Officers Presley and Hester approached Ms. Chappelle's house, they saw appellant inside, coming down the stairs from the second floor. They lost sight of him briefly as he appeared to duck to one side at the foot of the stairs, and then he walked out the front door and approached them. In response to the officers' questions, appellant falsely said that he was Ms. Chappelle's nephew "Tyrone Jefferson," and that she was out wandering the neighborhood, drunk. The officers asked appellant for some identification. In response, he led them inside the house to the kitchen. On the way, appellant passed

momentarily out of the officers' sight as he walked by a refrigerator. In the kitchen, appellant began searching the cabinets but could not produce any identification papers. The officers noticed that appellant's pockets were bulging and asked him what was in them. Appellant removed four cans of "potted" meat. One of the officers opened the refrigerator and saw identical cans inside.[2]

Officer Hester then left the kitchen to search the house for Ms. Chappelle. He found her lying semi-conscious in the hallway at the top of the stairs to the second floor. The medical examiner testified at trial that she had sustained blunt force injuries to her head and face (which led to her death eleven days later from a pulmonary embolism). Officer Hester observed that Ms. Chappelle's left ring finger had been severed and that there was a pool of blood around her hand. On the floor nearby were a pair of scissors and a purse with a torn shoulder strap. Ms. Chappelle's bedroom appeared to have been ransacked.

The officers placed appellant under arrest, handcuffed him, and took him upstairs while they continued to search the house. They found no one else present and no signs of forced entry. Other than the front door, there were no other means of ingress to or egress from the house.[3]

Later that morning, the police found a bloody butcher knife sitting on a chair near the front door, at the foot of the interior staircase where Officers Presley

appellant's cousin, testified at trial that she had spoken with him about Ms. Chappelle a month before the assault. Ms. Chappelle was yelling about being robbed on that occasion too, and Ms. Glover told appellant that she hollered all the time like that because she had Alzheimer's disease. Other witnesses at trial offered similar testimony about Ms. Chappelle's behavior and her mental condition.

2. Appellant's cousin testified at trial that he had tried unsuccessfully to obtain money from her earlier that evening because he was hungry and wanted to purchase food.

3. Edward Simms testified at trial that he controlled access to the house in order to limit his aunt's movements because of her dementia.

and Hester had seen appellant duck down. Both the knife and the scissors were collected as evidence. After the police left, Mr. Simms's wife found two rings sitting on top of the refrigerator that appellant had passed when he led the police into the kitchen. According to her family, Ms. Chappelle normally wore these rings on her hand. A crime scene search officer retrieved the rings twelve days later, on May 30, and returned in July to collect Ms. Chappelle's torn purse. During that visit, he also received a pipe wrench from Mr. Simms, who explained that it normally was kept in a drawer in the kitchen, but was found in the dining room the day after the assault on his aunt.

The knife, scissors, rings, and appellant's clothing were submitted to the FBI for serologic, hair, and fiber analysis.[4] (DNA testing apparently was unavailable at the time.) The FBI laboratory examination revealed the presence of human blood on the knife and on appellant's shorts, sweat pants, and right shoe. The blood could not be typed, nor could the examination identify its source or determine when it had been deposited on appellant's clothing. No blood (or hair or fibers) were found on the scissors or rings.[5]

Appellant was charged with armed first-degree murder, armed mayhem, armed robbery of a senior citizen, and first-degree burglary. The prosecution theory at trial was that appellant entered Ms. Chappelle's house to rob her, and that he bludgeoned her and severed her left ring finger with the butcher knife in order to steal her rings. The theory of appellant's defense was innocent presence. Although appellant did not testify or present any other material evidence in his defense, his counsel contended that he had entered Ms. Chappelle's home to defend her after hearing her call out for help, and that she had been attacked and robbed by an unidentified assailant who was already inside. Counsel argued that appellant's clothing became blood-stained because the arresting officers had directed him to lie down on the bloody floor near Ms. Chappelle's body during his initial detention. The jury rejected appellant's defense and found him guilty as charged.

## II.

On September 25, 2002, appellant filed a *pro se* motion to vacate his conviction and sentence pursuant to D.C.Code § 23–110. The trial judge construed the motion as encompassing a claim under the IPA and appointed counsel to represent appellant. To establish that he was not Ms. Chappelle's assailant, appellant sought DNA testing of the evidence recovered by the police. The government opposed testing of the scissors, rings, purse, and wrench on the ground, among others, that no "biological material" within the meaning of the IPA was present on those items. The government eventually consented, however, to DNA testing of appellant's clothing and the knife, on which some biological material (blood) had been found. The parties accordingly agreed to have the clothing and knife tested by Molecular World, Inc., an independent laboratory of appel-

---

4. The purse and the pipe wrench were not tested. A police evidence technician testified at trial that he did not see any blood in or on the purse and did not submit it to the FBI. Apparently the wrench was not sent to the FBI for testing either. Considering that it was not collected until two months after Ms. Chappelle was attacked and had been handled in the interim, the inference is strong that the wrench was not, and did not appear to be, a likely or suitable candidate for serologic, hair, or fiber analysis.

5. It also appears the police were unable to recover any useful fingerprints from the evidence collected at Ms. Chappelle's house.

lant's choosing. Appellant reserved his right to request analysis of the other items if necessary.

Molecular World was able to recover DNA from the blood it found on the knife and appellant's shoes, but it could not obtain a DNA profile from its samples, "indicating that the DNA isolated from these items was highly degraded." [App. 3 at 3] The laboratory could find no blood, and hence could not isolate any DNA, on the other articles of clothing it tested. Although its test results were inconclusive, Molecular World noted that it might be possible to derive a nuclear DNA profile from other, untested evidence, "if [a] sufficient amount of biological material (such as blood, semen or skin cells) is present." [*Id.*]

Over a year after receiving Molecular World's report, appellant filed a supplemental motion for additional DNA testing. Appellant argued that the perpetrator of the crime must have handled the items of evidence not yet tested and could have deposited trace epithelial (skin) cells on them. It is possible, appellant maintained, that those skin cells, though too small to be seen by the naked eye, still might be present and might have recoverable DNA from which a profile could be obtained—a profile that would demonstrate he was not the person who assaulted Ms. Chappelle and, perhaps, enable the authorities to identify the actual culprit. The same possibility exists, appellant argued, with respect to the handle of the butcher knife (which Molecular World had not examined for the presence of skin cells). Accordingly, invoking both the IPA and the Fifth Amendment's Due Process Clause, appellant asked the court to order testing for DNA in trace skin cells on the scissors, rings, purse, wrench, and knife handle.

The government opposed this request on the principal grounds that (1) trace skin cells are not within the IPA's definition of "biological material" subject to DNA testing, and (2) even if they were, further DNA testing would not help establish appellant's innocence. In an order issued on November 13, 2008, the motion judge agreed with those reasons for rejecting appellant's request and denied his motion for relief from his convictions. Before us now is appellant's timely appeal of those rulings.

## III.

Upon proper application by a person in custody pursuant to a judgment of conviction for a crime of violence, the IPA authorizes and requires the Superior Court to order post-conviction DNA testing of "biological material" that was recovered as evidence in the case.[6] "Biological material" is a defined term. It *"means* a sexual assault forensic examination kit, semen, vaginal fluid, blood, saliva, visible skin tissue, or hair which apparently derived from the perpetrator of a crime or, under circumstances that may be probative of the perpetrator's identity, apparently derived from the victim of a crime."[7] An applicant must show that the evidence comes within this definition; the IPA does not authorize the court to order post-conviction DNA testing if it does not.

Another condition an applicant must meet in order to obtain post-conviction DNA testing is a materiality requirement. The court must "determin[e] that ... there is a reasonable probability that testing will produce non-cumulative evidence that would help establish that the appli-

---

6. D.C.Code § 22–4133(a).

7. D.C.Code § 22–4131(2) (emphasis added).

cant was actually innocent of the crime for which the applicant was convicted[.]" [8]

We conclude that appellant failed to satisfy the foregoing statutory requirements. We also conclude that appellant was not denied due process of law by the judge's refusal to order the additional DNA testing he requested.

## A. Appellant's Failure to Identify "Biological Material" for Testing

 Whether trace skin cells are "biological material" under the IPA is a question of statutory interpretation that this Court reviews de novo.[9] "Statutory interpretation is a holistic endeavor, and, at a minimum, must account for the statute's full text, language as well as punctuation, structure, and subject matter." [10] Generally speaking, "if the 'plain meaning' of statutory language 'is clear and unambiguous and will not produce an absurd result, we will look no further.' " [11] When the terms of a statute are undefined and not recognized terms of art, we presumptively accord them their ordinary meaning in common usage, taking into account the context in which they are employed; [12] but "[w]hen a legislature defines the language it uses, its definition is binding upon the court even though the definition does not coincide with the ordinary meaning of the words." [13] The primacy of the statutory text means that resort to legislative history to construe a statute is generally unnecessary (if not, indeed, disfavored); usually it is appropriate only to resolve a genuine ambiguity or a claim that the "plain meaning" leads to a result that would be absurd, unreasonable, or contrary to the clear purpose of the legislation.[14]

We do not doubt that trace skin cells are, in common parlance, "biological material." But that is not the issue; "biological material" is a defined term in the IPA, and the definition is not nearly as broad as common parlance would permit it to be. The statutory definition is limited to seven categories of material derived from living tissue. Skin cells are included as one of those categories, but only if they are "visible." The word "visible" is not defined in the statute, but we do not find it to be ambiguous. It is not a technical term, and therefore we presumptively should construe it according to its meaning in ordinary or common speech. For that meaning we may look to the dictionary.[15] There

8. D.C.Code § 22–4133(d).

9. See Veney v. United States, 929 A.2d 448, 459 (D.C.), modified on other grounds, 936 A.2d 809 (D.C.2007).

10. Cook v. Edgewood Mgmt. Corp., 825 A.2d 939, 946 (D.C.2003) (internal quotation marks and citation omitted).

11. Hargrove v. District of Columbia, 5 A.3d 632, 634 (D.C.2010) (citations omitted).

12. See, e.g., Peoples Drug Stores, Inc. v. District of Columbia, 470 A.2d 751, 753 (D.C. 1983) (en banc) ("[I]n examining the statutory language, it is axiomatic that '[t]he words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them.' ") (quoting

Davis v. United States, 397 A.2d 951, 956 (D.C.1979)).

13. District of Columbia v. Jerry M., 717 A.2d 866, 871 (D.C.1998); see also Lopez v. Gonzales, 549 U.S. 47, 54, 127 S.Ct. 625, 166 L.Ed.2d 462 (2006) (noting that the legislature is "free to be unorthodox" and may define terms "in an unexpected way," provided it does so expressly).

14. See, e.g., District of Columbia v. Edison Place, 892 A.2d 1108, 1111 (D.C.2006); Duvall v. United States, 676 A.2d 448, 452 (D.C. 1996).

15. See 1618 Twenty–First St. Tenants' Ass'n, Inc. v. The Phillips Collection, 829 A.2d 201, 203 (D.C.2003) ("In finding the ordinary meaning, '[t]he use of dictionary definitions is

we find that, as used adjectivally in a context such as this one, "visible" means "capable of being seen: perceptible by vision."[16] This ordinary meaning of "visible" excludes the trace skin cells appellant seeks to find and test, because those cells are microscopic and certainly not perceptible to normal (or even exceptional) eyesight.

Appellant, supported by the amicus, resists this conclusion. He contends that the ordinary meaning of "visible" is too narrow to effectuate the purpose of the IPA, which is to enable wrongly convicted persons to use the powerful techniques of DNA analysis to prove their innocence. Skin cells (and other biological evidence) can be transferred and deposited by touch in minute amounts and need not be visible to the naked eye to be amenable to those techniques. Consequently, appellant and amicus argue, to avoid a result that is absurdly at odds with the statutory purpose, the word "visible" must be construed broadly to include what is perceptible with a microscope or other advanced technology. In other words, amicus contends, we should construe the term "visible" in the context of a statute such as the IPA as meaning

"observable using standard DNA collection and analysis practice."[17]

This may be a good prescription for legislative action, but we think it does not pass muster as statutory interpretation. To begin with, given the extraordinary sensitivity and refinement of current DNA testing techniques, the alternative construction of "visible" proposed by appellant and amicus would render the word superfluous. It is indeed possible for laboratory technicians to obtain an individual's genetic profile from minuscule samples. The Short Tandem Repeat technology now in use "requires literally cellular-size samples only," and "can often yield reliable results from even a single cell."[18] If "visible skin tissue" meant any skin tissue usefully observable through an available enhancement technique, then *any* amount of skin tissue, even down to a single skin cell or cell fragment (though the word "tissue" connotes an aggregation of cells[19]) would be considered "visible" through magnification, and the adjective "visible" would be devoid of meaning.

An interpretation of "visible" that deprives the term of any significance is diffi-

appropriate in interpreting undefined statutory terms.' ") (citations omitted).

16. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2557 (1997). The word "vision" has diverse meanings depending on the context, *see id.,* but as used here, in conjunction with the word "seen," it clearly refers to eyesight.

17. Brief of Amicus Curiae at 8. Indeed, amicus claims, the forty-eight other jurisdictions that have adopted innocence protection statutes all permit the court to order post-conviction DNA testing of trace amounts of skin and other biological tissue. The federal statute, for example, defines "biological evidence" as "(1) a sexual assault forensic examination kit; or (2) semen, blood, saliva, hair, skin tissue, or other identified biological material." 18 U.S.C. § 3600A (b) (2006). The Maryland statute comparably states that " '[b]iological

evidence' includes, but is not limited to, any blood, hair, saliva, semen, epithelial cells, buccal cells, or other bodily substances from which genetic marker groupings may be obtained." Md.Code Ann., Crim. Proc. § 8–201(a)(2) (West 2011).

18. *Harvey v. Horan,* 285 F.3d 298, 305 & n. 1 (4th Cir.2002) (concurring opinion of Luttig, J., respecting the denial of rehearing en banc) (citing I. Findlay *et al., DNA Fingerprinting from Single Cells,* 389 NATURE 555 (1997)).

19. *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2399 (defining biological "tissue" as "an aggregate of cells usu[ally] of a particular kind or kinds together with their intercellular substance that form one of the structural materials out of which the body of a plant or an animal is built up").

cult to justify, even if it might facilitate efforts to exonerate the innocent.[20] We do not agree with appellant that such an interpretation is necessary because construing the word "visible" in its ordinary sense would be inconsistent with the IPA's purpose and distort the Council's handiwork. The legislative history of the IPA—which we properly may examine to evaluate whether our interpretation would sabotage the statute—refutes appellant's claim. It shows the Council deliberately and rationally adopted a definition of "biological material" that excludes trace skin cells in order to reduce the burdens that the new right to DNA testing would place on law enforcement.

Bill 14–153, the "Innocence Protection Act of 2001," was introduced in the Council of the District of Columbia on March 20, 2001, and referred to the Committee on the Judiciary. As originally introduced, the bill did not define the term "biological material."[21] But the bill required the police to preserve such material for DNA testing, and at a public hearing on the legislation, the Executive Assistant Chief of Police expressed concern that this duty would impose a heavy burden on the Police Department—one it was not equipped to undertake—to handle and store voluminous DNA evidence for long and indeterminate periods of time.[22] In its first report on the legislation, the Judiciary Committee identified this as a "very valid concern." The Committee recommended addressing the concern, in part, by defining "biological material" so that the police "would have [to] preserve small samples of blood, or hair, [but] not entire automobiles and couches."[23] The Committee's suggested definition read as follows:

"Biological material" means evidence of an organic nature allegedly derived from the perpetrator of a crime. The term "biological material" includes:

(A) A sexual assault forensic examination kit; and

(B) Semen, blood, saliva, skin tissue or hair sample.[24]

As a means of reducing the evidence preservation burden on the police, this initial attempt was imperfect—most obviously because the list of evidence encompassed in the definition was not necessarily all-inclusive, and because the list included "skin tissue" without qualification.

Subsequently, however, the Judiciary Committee revised the definition and corrected these problematic features. The amended statute accompanying the second report of the Committee defined "biological material" in terms of an all-inclusive list, and—more importantly, for present purposes—it inserted the word "observable" to modify "skin tissue."[25] Shortly

---

**20.** *See, e.g., School St. Assocs. Ltd. P'ship v. District of Columbia,* 764 A.2d 798, 807 (D.C. 2001) ("Common rules of statutory construction require us to avoid conclusions that effectively read language out of a statute whenever a reasonable interpretation is available that can give meaning to each word in the statute."); *Thomas v. District of Columbia Dep't of Employment Servs.,* 547 A.2d 1034, 1037 (D.C.1988) ("A basic principle is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.").

**21.** D.C. Council, Comm. on the Judiciary, Report on Bill 14–153, "Innocence Protection Act of 2001," Attachment (A) (Oct. 11, 2001) ("Oct. 11, 2001 Committee Report").

**22.** Oct. 11, 2001 Committee Report, at 7.

**23.** *Id.*

**24.** *Id.,* Attachment (F) at 1.

**25.** The new definition read as follows:

"Biological material" means a sexual assault forensic examination kit, semen, vagi-

thereafter, in the final enrolled version of the bill that became law, the word "visible" was substituted for "observable."[26] The changes reduced the burden on the police to identify and preserve biological material for future DNA testing.[27] We would be thwarting the Council's intent if we were to interpret the word "visible" as appellant and amicus propose; indeed, given the ease with which trace skin cells can be deposited on all manner of surfaces and substances, and remain on them indefinitely, such an interpretation might require police to collect anything and everything at a crime scene that the perpetrator could have touched.[28]

Appellant argues that the exclusion of trace amounts of skin tissue (and any other readily available source of potentially relevant DNA, for that matter) from the class of biological material subject to post-conviction DNA testing is arbitrary and irrational, and contravenes his right to due process. He acknowledges that the Supreme Court has declined to recognize "a freestanding right to DNA evidence" as a matter of substantive due process.[29] Even

so, he asserts, he has "a liberty interest in demonstrating his innocence with new evidence under [District of Columbia] law" (the IPA), and this statutorily-created right "beget[s] yet other rights to procedures essential to the realization of the parent right"[30]—including a right to test *any* DNA-containing evidence that has been preserved in this case and that might show his innocence. If the IPA is interpreted to withhold that right, appellant contends, it denies him procedural due process.

■ We agree with appellant's premise: The IPA has created a liberty interest in providing for post-conviction relief, and the District's procedures for vindicating that interest must satisfy due process.[31] But the Supreme Court emphasized in *Osborne* that a state (or, as in this case, the District of Columbia) is allowed considerable "flexibility in deciding what procedures are needed in the context of postconviction relief," because "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man."[32] We therefore are obliged to up-

nal fluid, blood, saliva, observable skin tissue, or hair which apparently derived from the perpetrator of a crime or, under circumstances that may be probative of the perpetrator's identity, apparently derived from the victim of a crime.
D.C. Council, Comm. on the Judiciary, Report on Addendum to Bill 14–153, "Innocence Protection Act of 2001," Attachment (E) (Jan. 29, 2002) at 1.

**26.** *See* D.C. Law 14–134 § 2(2), 49 D.C.Reg. 408 (2002).

**27.** Law enforcement agencies are required to preserve "biological material" seized or recovered as evidence in a case for five years or as long as any person remains incarcerated in connection with the case, whichever is longer. D.C.Code § 22–4134(a). (After five years, however, the District of Columbia is allowed to dispose of the evidence if it first notifies potentially affected persons and affords them

an opportunity to apply for DNA testing. *See* D.C.Code § 22–4134(b).)

**28.** We cannot construe "visible" narrowly when the question is whether skin tissue evidence must be preserved for DNA testing, yet broadly when the question is whether it is subject to that testing. As the IPA is written, the same definition of "biological material" provides the answer to both those inquiries.

**29.** *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne,* —— U.S. ——, 129 S.Ct. 2308, 2322, 174 L.Ed.2d 38 (2009).

**30.** *Id.* at 2319 (quotation marks and citation omitted).

**31.** *Id.* at 2319–20.

**32.** *Id.* at 2320. An individual who "has already been found guilty at a fair trial ... has only a limited interest in postconviction relief." *Id.*

hold the IPA's limitation on the types of biological materials that will be subject to post-conviction DNA testing unless appellant can establish that it " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses [a] recognized principle of fundamental fairness in operation.' " [33] Otherwise put, we "may upset [the District's] postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided." [34]

We conclude that, to resolve this appeal, we need not decide the constitutional challenge that appellant presents to the IPA's limited definition of "biological material" subject to post-conviction DNA testing. We would find his challenge a pressing and difficult one if we thought it reasonably probable that the DNA testing he requests

actually would help him establish his innocence and thus provide him with the key to the door of his prison cell. The District of Columbia appears to be the only jurisdiction in the United States with a statutory right to post-conviction DNA testing that would deny testing on trace amounts of skin tissue that might provide exoneration; [35] and outside of § 22–4133 of the IPA, it is at best unclear whether any procedural route exists for someone in appellant's position to obtain a court order for such testing. [36] Moreover, while there are practical reasons for alleviating the burden on law enforcement to preserve any and all evidence that might contain invisible traces of a perpetrator's skin cells, we are aware of no practical, or scientific, reasons for *categorically* excluding such evidence from DNA testing, regardless of its value, when in fact it has been preserved. [37]

**33.** *Id.* (quoting *Medina v. California*, 505 U.S. 437, 446, 448, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)).

**34.** *Id.*

**35.** See note 17, *supra*. Contemporary practice among the states may be relevant to the due process inquiry. *See id.* at 2320 (noting that Alaska's procedures for DNA testing are "similar to those provided by federal law and the laws of other States"); *Cooper v. Oklahoma*, 517 U.S. 348, 360, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996); *Patterson v. New York*, 432 U.S. 197, 207 n. 10, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *see also Herrera v. Collins*, 506 U.S. 390, 410–11, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (stating that practice in the states today is "of limited relevance" but may inform the historical inquiry).

**36.** The government states that "although the IPA does not *require* a trial court to follow its procedures in cases involving mere 'trace' DNA, neither does the statute *prohibit* a court from ordering independent post-conviction DNA testing in a particular case, where the facts and circumstances warrant." Brief for Appellee at 30. In support of that proposition, the government cites our holding in *Gibson v. United States*, 566 A.2d 473, 478 (D.C.

1989), that trial courts have discretion to order post-conviction discovery in aid of a new trial motion based on newly discovered evidence. In *Gibson*, however, unlike here, the movant was able to make specific allegations of potentially exculpatory evidence in the possession of the government (namely, a police detective's report of investigation credibly suggesting that another person perpetrated the offense.)

The IPA itself provides that a trial court has discretion to grant discovery in aid of a motion to vacate a conviction on the ground of actual innocence. *See* D.C.Code § 22–4135(e)(4) ("A movant shall be entitled to invoke the processes of discovery available under Superior Court Rules of Criminal Procedure or Civil Procedure, or elsewhere in the usages and principles of law if, and to the extent that, the judge, in the exercise of the judge's discretion and for good cause shown, grants leave to do so, but not otherwise."). The parties to the present appeal have not addressed the potential applicability of this provision, and we leave that question for resolution when it is squarely presented.

**37.** We are advised that Short Tandem Repeat DNA testing can be used successfully even with degraded and low-quality samples. *See,*

But like its counterparts in other jurisdictions, the IPA requires the applicant to demonstrate the materiality of the post-conviction testing sought—the reasonable probability that it will help prove the applicant's innocence.[38] The imposition of this requirement is compatible with due process, and appellant does not contend otherwise.[39] As we proceed to explain, appellant cannot establish a due process violation because he has not satisfied the IPA's materiality requirement.

## B. Appellant's Failure to Demonstrate Materiality

Whether an applicant for post-conviction DNA testing has demonstrated "a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent"[40] is, typically, a mixed question of fact and law. We defer to the trial court's reasonable determination of disputed facts. Whether the established or uncontested facts suffice to demonstrate the requisite degree of materiality is a question of law for our *de novo* review.

"Reasonable probability" is a legal term of art borrowed from constitutional jurisprudence. When a defendant is required to show a "reasonable probability" of prejudice in order to obtain post-conviction relief for a violation of his constitutional rights, the harm of which he complains (suppression or exclusion of exculpatory evidence, or deficient performance of counsel, for example) must be significant enough that it "undermines confidence" in the trial's outcome.[41] This means more than a mere possibility of prejudice. The IPA evidently requires an applicant for post-conviction DNA testing to make a comparable showing and demonstrate something more than a mere possibility that the test results would help him prove his actual innocence in spite of all the evidence of his guilt.[42]

In the present case, assuming that trace skin cells are present, and that the requested testing would result in the recovery of a usable DNA profile (of someone other than appellant or the victim),[43] appellant cannot show a reasonable probability

---

e.g., *Harvey v. Horan*, 285 F.3d 298, 305 & n. 1 (4th Cir.2002) (concurring opinion of Luttig, J., respecting the denial of rehearing en banc).

**38.** See *Osborne*, 129 S.Ct. at 2317 ("A requirement of demonstrating materiality is common.").

**39.** See *id.* at 2321 (holding that the procedural requirements of Alaska law, including a requirement that the DNA evidence sought be "sufficiently material," are "not inconsistent with the 'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness.'" (citation omitted)).

**40.** D.C.Code § 22–4133(d).

**41.** *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

**42.** The purpose of the testing, after all, is to develop new evidence that would support a

motion to vacate a conviction or grant a new trial on the ground of actual innocence. See D.C.Code § 22–4135. To that end, the new evidence must "demonstrate[] that the movant is actually innocent despite having been convicted at trial or having pled guilty." *Id.* § 22–4135(c)(2). See also *id.* § 22–4135(g) (requiring proof of actual innocence by at least a preponderance of the evidence).

**43.** We do not agree with appellant that, in ruling on an application for post-conviction DNA testing, the court always must assume that such testing will result in usable DNA information. In some cases, the trial court may have sufficient reason (such as an expert's report) to conclude that no DNA evidence is present, or that any DNA is too degraded, diluted, or contaminated to produce a useful result. See, e.g., *Cuffey v. United States*, 976 A.2d 897, 899 (D.C.2009) (declining to order testing where the sheer amount of the victim's blood on the item was expected to mask the presence of DNA from any other

that this would assist him to establish his actual innocence of Ms. Chappelle's murder. Appellant. has advanced no plausible scenario in which traces of a third person's skin cells (years after the event) would exonerate him. Indeed, there is no evidence that anyone other than appellant and Ms. Chappelle was even present at the time of the assault (and appellant certainly has not identified or described another possible perpetrator whose link to the crime could be corroborated through DNA testing).[44] Appellant did not testify and offered no such evidence at his trial; nor did he set forth the facts in the bare-bones affidavit of innocence that he filed in support of his IPA motion.[45] Thus, as far as the evidentiary record is concerned, we have only the uncontradicted testimony at trial that appellant was alone in the house with Ms. Chappelle when she was attacked; he was the only person seen leaving the premises after the crime; and no one besides appellant and Ms. Chappelle was there when the police arrived.[46]

Moreover, if we nonetheless entertain the suggestion that another person some- how *could* have committed the assault, traces of a third person's skin cells on the items of evidence in this case would not prove it. These items were ordinary personal and household objects that Ms. Chappelle wore (the rings) or carried around with her (the purse), or that she and others put to everyday use (the knife, scissors and wrench). As the judge below found, the presence of third-party skin cells on these objects might mean someone other than appellant or Ms. Chappelle touched them *at some point in time;* but that proves nothing, because it would not mean that the cells were deposited on the items during or around the time of the attack. They just as easily could have been left on the objects before or after the crime was committed, under circumstances having nothing to do with it—for example, by family members, acquaintances, or strangers making use of the objects or merely touching them in ordinary social interactions with Ms. Chappelle; or, for that matter, by investigators or unknown persons who could have handled the objects after the police acquired custody of them.[47]

contributor). However, because no such finding was made here, and recognizing that even degraded samples may generate valuable information, we will assume *arguendo* that testing could result in a usable DNA profile.

**44.** *Cf. United States v. Fasano,* 577 F.3d 572, 578 (5th Cir.2009) (ordering DNA testing of a bank robbery demand note where the defendant had accused an acquaintance who had access to the receipt upon which the note was written); *Gregg v. State,* 409 Md. 698, 976 A.2d 999, 1011–12 (2009) (ordering testing of epithelial cells collected by police from the trigger of the murder weapon where identification was in issue and the defendant had accused the fellow occupant of his vehicle of being the true murderer).

**45.** An application for post-conviction DNA testing must be accompanied by an affidavit in which the applicant states under penalty of perjury that he is actually innocent of the crime. D.C.Code § 22–4133(b)(1). Appellant's affidavit contained that required averment with no factual elaboration or explanation.

**46.** Furthermore, of course, there was other highly incriminating evidence against appellant, such as the lies he told the police, the cans of "potted" meat in his pockets, and the blood on his clothing. The DNA evidence appellant sought would not have explained this evidence away.

**47.** There is no indication that the police took any measures to prevent the items from being handled (and "contaminated" with stranger DNA) after they were collected as evidence. Although the IPA requires law enforcement agencies to preserve biological material that was seized or recovered as evidence, *see* D.C.Code § 22–4134, this requirement was not in effect when the police were investigating Ms. Chappelle's murder.

In short, the discovery of a stranger's DNA in trace skin cells would do exceedingly little, if anything, to rebut the overwhelming evidence of appellant's guilt. All things considered, we readily conclude that appellant failed to show a reasonable probability that the testing he requested would produce non-cumulative evidence that would help establish his actual innocence of the crimes for which he was convicted.

### IV.

We hold that appellant's supplemental application for post-conviction DNA testing did not meet the requirements of the post-conviction testing provision of the IPA, D.C.Code § 22–4133, and the rejection of that application did not deprive appellant of due process of law. We affirm the order of the Superior Court denying appellant relief from his convictions under the IPA.

*So ordered.*