EASTERLY, Associate Judge,
concurring in part and dissenting in part:
I concur with the conclusion of Part II.B.2 that S.W. did not voluntarily waive his Miranda rights. In my view, however, it is unnecessary and ill-advised for us to reach the issue of the voluntariness of S.W.’s waiver.
Our analysis should begin and end with an examination of the warnings the detective gave to S.W. before S.W. waived his rights. To be sure, the detective read from a preprinted card that addressed the topics mandated by Miranda.[1] But that was not all the detective said about S.W.’s rights to remain silent and to counsel, or about the detective’s own role in any interrogation that might follow. Immediately prior to reading S.W. the rights card, the detective incorrectly communicated to S.W. that he was not S.W.’s adversary; that he, unlike “the lions,” i.e., his colleagues outside the room, was seeking to help S.W.; that the lions were going to try to falsely accuse S.W. of things S.W. had not done; that the only way he could help S.W. and keep the lions at bay was if S.W. talked; and that he and S.W. could not talk unless S.W. waived his rights. Having delivered this preamble, the detective then read aloud from the preprinted card and, unsurprisingly, S.W. waived his rights — unsurprisingly, because the warnings as a whole did not “reasonably convey to [S.W.] his rights as required by Miranda ” and did not under “these circumstances ... function effectively.” See Missouri v. Seibert, 542 U.S. 600, 611, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (quoting Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989)).
“Just as no talismanic incantation is required to satisfy Miranda’s strictures, it would be absurd to think that mere recita *106 tion of the litany suffices to satisfy Miranda in every conceivable circumstance.” Id. (quoting California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981)). In other words, we cannot be satisfied that adequate and effective warnings have been given every time the police read from a preprinted rights card, no matter what else the police say. See id. That would miss the point of. Miranda entirely.
In Miranda, the Supreme Court recognized “that the modern practice of in-custody interrogation is psychologically rather than physically oriented.” 384 U.S. at 448, 86 S.Ct. 1602. The Court described a number of interrogation techniques, among them “the Mutt and Jeff act,” a classic bad cop-good cop routine.[2] Id. at 452, 86 S.Ct. 1602. It explained that the police, “by trading on [an[1] interviewee’s] insecurity about himself or his surroundings!,] • • • • persuade, trick or cajole him out of exercising his constitutional rights.” Id. at 455, 86 S.Ct. 1602. The Court concluded that the “traditional” totality-óf-the-circumstances test for identifying involuntary confessions (more easily employed when an individual was physically coerced) was not up to the task of assessing the effect of these various psychological pressures on an individual suspect and thus provided inadequate protection against compelled self-incrimination. See id. at 457, 467, 86 S.Ct. 1602; see also Seibert, 542 U.S. at 608, 124 S.Ct. 2601; Dickerson v. United States, 530 U.S. 428, 442, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The Court was concerned that “[r]ights declared in words,”-namely, the right against compelled self-incrimination and the right to the assistance of counsel, “might be lost in reality.” 384 U.S. at 443, 86 S.Ct. 1602 (quoting Weems v. United States, 217 U.S. 349, 373, 30 S.Ct. 544, 54 L.Ed. 793 (1910)). It determined that procedural safeguards were needed: warnings that could serve as a “clearcut fact” that the interviewee had been advised and thus was aware of the constitutional protections available to him in the adversarial setting of an interrogation.[3] Id. at 468-69, 86 S.Ct. 1602.
With respect to these warnings, the Court made one thing pellucidly clear: *107 function was all. The Court eschewed “impotent and lifeless formulas.” 384 U.S. at 443, 86 S.Ct. 1602 (quoting Weems, 217 U.S. at 373, '30 S.Ct. 544). It never endorsed a script. Two core constitutional rights had to be addressed — the right to remain silent and' the right to counsel (court-appointed if the individual could not afford to hire an attorney) — and the individual had to be told that his words could be used against him in court so that he would be “acutely aware that he is faced with a phase of the. adversary system— that he is not in the.presence of persons acting solely in his interest.” Id. at 469, 86 S.Ct. 1602. But the Court was willing to leave the particular procedures and precise phrasing to individual jurisdictions so long as these procedures and warnings “adequately and effectively” protected individuals’ rights against coerced self-incrimination. Id. at 467, 86 S.Ct. 1602.[4]
“There [were] those, of course, who preferred the old way of doing things,” i.e., “giving no warnings.” Seibert, 542 U.S, at 609, 124 S.Ct. 2601. And attacks were mounted against Miranda warnings — both direct, see, e.g., Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), and indirect. “The technique of interrogating in successive unwarned and warned phases,” at issue in Seibert, was but one “police strategy adapted to undermine the Miranda warnings.” [5] Seibert, 542 U.S. at 609, 616, 124 S.Ct. 2601. The Court condemned that effort to deprive a defendant of “a real choice between talking and remaining silent.” Id. at 609, 124 S.Ct. 2601. And it emphatically stated that the “mere recitation of the litany” would not always suffice; that the context in which these recitations were made could disable these warnings; and that “it would be absurd to think” otherwise. Id. at 611,124 S.Ct. 2601. The Court concluded by warning the “[sjtrate-gists dedicated 'to draining the substance out of Miranda” that they could not accomplish indirectly “what Dickerson held Congress could not dó by statute,” i.e., remove Miranda warnings as a first-line defense against compelled custodial interrogations.[6] Id. at 617, 124 S.Ct. 2601.
Despite this admonition, these “strategists” did not give up after Seibert. They simply changed tactics, for example, by spiking the recitation of rights with a *108 preamble that tells the interviewee'in so many words: you really do not have a choice; waiver is your only option.[7] The Queens District Attorney’s Office in New York tried this in 2007, when it instituted a practice of delivering scripted warnings that commenced with detectives (with a prosecutor at their side) telling interviewees, among other things, “this is your opportunity to tell us your story,” and “[t]his will be your only opportunity to speak with us before you go to court on these charges.” People v. Dunbar, 24 N.Y.3d 304, 308-09, 998 N.Y.S.2d 679 (2014), cert. denied, — U.S.-, 135 S.Ct. 2051, 191 L.Ed.2d 971 (2015), cert. denied, — U.S. -, 135 S.Ct. 2052, 191 L.Ed.2d 971 (2015). The New York courts — first the intermediate courts of appeal, then the highest court in the state — decisively shut this practice down. The New York Court of Appeals explained that this “preamble, which is at best confusing and at worst misleading, rendered the subsequent Miranda warnings inadequate and ineffective.” Id. at 316, 23 N.E.3d 946. The court further explained:
Before they were read them Miranda rights, [the defendants] were warned, for all intents and purposes, that remaining silent or invoking the right to counsel would come at a price — they would be giving up a valuable opportunity to speak with an assistant district attorney, to have their cases investigated or to assert alibi defenses. The statements to “give me as much information as you can,” that “this is your opportunity to tell us your story” and that you “have to tell us now” directly contradicted the later warning that they had the right to remain silent. By advising them that speaking would facilitate an investigation, the interrogators implied that these defendants’ words would be used to help them, thus undoing the heart of the warning that anything they said could and would be used against them. And the statement that the prearraignment interrogation was their “only opportunity” to speak falsely suggested that requesting counsel would cause them to lose the chance to talk to an assistant district attorney.

Id.

As a consequence, the Court of Appeals determined that the issue was not whether “these defendants’ waivers were valid, but rather whether or not they were ever ‘clearly informed’ of their Miranda rights in the first place.” Id. The court determined that they were not. As the court explained, no one would defend “Miranda warnings [that] were preceded by statements that were directly contrary to those warnings (e.g., you are required to answer our questions; your statements will be used to help you; you are not entitled to a lawyer).” Id. “The preamble did the same thing, albeit in an indirect, more subtle way.... [A] reasonable person in these defendants’ shoes might well have concluded, after having listened to the preamble, that it was in his best interest to get out his side of the story — fast.” Id.[8]
The warnings delivered in this case were not, at least as far as we know, part of some MPD-wide protocol, but they were of *109 the same ilk as those employed in Dunbar, consisting of a neutralizing preamble followed by a recitation of rights. The detective gave his warnings to S.W. as follows:
I’m gonna give you an opportunity to give your version of what happened today, cause ... I stand between you and the lions out there. Cause they’re gonna think — right now we have a lotta things goin’ on out there, and they’re gonna try and say that you did it all. Okay? And I think what happened today was just a one-time thing. But before I came out here everybody said, you know, tryin’ to say you did a whole buncha stuff but ... in order for us to have a conversation, I have to read you your rights and you have to waive your rights. If you answer no to any of the questions I ask you after I read you your rights, that’s all — I mean, I can’t have the interview, okay? It’s uh, what’s today’s date? Today’s the 22nd, it’s about 11:54 p.m. You are under arrest. Before we ask you any questions, you must understand what your rights are-[Rights card is read]. Do you understand these rights?
S.W. responded yes, and then waived.
These warnings were just as confusing and misleading as those employed in Dunbar. The message that this was “an opportunity” for S.W. to better his position, and the encouragement to take it quickly, “implied that [S.W.’s] words would be used to help [him], thus undoing the heart of the warning that anything [he] said could and would be used against [him].” 24 N.Y.3d at 316, 998 N.Y.S.2d 679.[9] The exhortations to “waive” and talk now also “directly contradicted the later warning that [S.W.] had the right to remain silent,” id., not to mention a right to consult with counsel. The statement that if he did not waive, “that’s all,” also communicated that S.W.’s exercise of his rights “would come at a price” of giving up an irretrievable “opportunity” to speak to law enforcement. Id.
In addition, these warnings also included a coercive element that the warnings in Dunbar did not: the detective told S.W. that the lions were waiting for him outside the room, that only the detective could hold them at bay, and that the lions were, in the words of my colleague, ready to “fabricate! ] charges” against S.W.[10] These statements vitiated the recitation of rights that followed. The implication that S.W.’s constitutional rights to silence and to counsel would afford him no protection — that *110 only the detective could help S.W. — turns Miranda on its head.
The detective in this case applied the exact sort of psychological pressure that motivated the Supreme Court to require Miranda warnings in the first place. The detective’s tactics were startlingly similar to the “Mutt and Jeff act” described in Miranda, save for the fact that “Mutt”— here, “the lions” — remained off-stage. Moreover, these statements “obvious[ly]” had the “manifest purpose” of subverting Miranda and inducing S.W. not to remain silent and not to ask for a lawyer.[11] See Seibert, 542 U.S. at 613, 124 S.Ct. 2601. After all, if the detective had .truly wanted to help S.W., the detective could have done so without exhorting S.W. to waive his rights (or without Mirandizing him at all), because Miranda would not have imposed any limit on the government’s use of S.W.’s statements for that purpose.[12]
Nevertheless, my colleagues in the majority as to Part II.A conclude that the warnings in this case “adhered to the dictates of Miranda” and were “effectively delivered.” To do so, they rely almost exclusively on Hairston v. United States, 905 A.2d 765 (D.C.2006), a case applying Seibert to a very different set of facts (so different that the government apparently did not deem Hairston relevant and did not cite it to us). Glossing over those differences, my colleagues seem to read Hairston as announcing a per se rule that, as long as a defendant does not speak before the police read from the rights card, the recitation of the information on the card constitutes an effective warning, no matter what else the police say in conjunction with that recitation.[13] But Hair-ston, which clearly employed a fact-specific analysis, does not announce such a rule.[14]
The question in Hairston was whether the detective had reduced the effectiveness *111 of the Miranda warnings by withholding them until after he had outlined some of the evidence that the police had already developed against the defendant.- 905 A.2d at 769-70. When speaking-to the defendant in Hairston, the detective stuck to the facts. Unlike in this case, the detective made no affirmative representations to. the defendant about the detective’s ability to protect the defendant from hostile-forces, much less did he exhort the defendant to waive his rights so that the detective could “help” him. And unlike in this case, nothing the detective said obscured the nature of the rights he recited to the defendant. Before reading the defendant the rights card, the detective in Hairston simply asked the defendant whether “he want[ed] any help in this case, and ... want[ed] to tell [the detective] his side of the story.” Id. at 772. Based on the particular facts of the case, this court held that the Miranda warnings were effective. Id. at 782. But we indicated that, “[d]e-pending on context,” similar behavior by the police might violate a defendant’s rights, and that we would not approve of tactics that “resemble[d] the kind of mental games that largely generated the Miranda decision itself.” Id. (quoting United States v. Brown, 737 A.2d 1016, 1021 (D.C. 1999)). As explained above, the tactics used in S.W.’s case do fall into that category; thus Hairston does not support my colleagues’ determination that the Miranda warnings delivered to S.W. were effective.
The court ultimately reaches the right result in this case — reversal—based on the determination that S.W.’s waiver of his rights was involuntary. See Part II.B.2; Part III. But it does so by holding that S.W. was subjectively coerced by the very statements it determines did not objectively compromise the effectiveness of the recitation of S.W.’s rights. My colleague in dissent on the .issue of voluntariness rightly points' out that the majority opinion is in tension with itself. He asserts that this tension supports a conclusion that S.W.’s waiver was voluntary. For the following reasons, I disagree. , ■
It is “our judicial duty,” even as we view the facts in the light most favorable to the government, to “indulge every reasonable presumption” against S.W.’s waiver of his rights.[15] Dorsey v. United States, 60 A.3d 1171, 1204 (D.C.2013) (quoting Zerbst, 304 U.S-. at 464, 58 S.Ct. 1019). To determine if S.W.’s will was overborne, the majority *112 opinion rightly looks to what the detective said to S.W. just before he waived his rights. The majority opinion also rightly looks to S.W.’s ability to understand and appreciate his circumstances. S.W. was just fifteen years old and, as such, was generally more susceptible to influence and coercion.[16] Moreover, as the government attorney in this case acknowledged, S.W. had been diagnosed with ADHD and depression and was receiving special education and related services; his circumstances prompted the court to observe at sentencing that S.W. “needled] a lot of work, a lot of help,” both in terms of treatment and medication.[17]
Beyond these facts, I cannot ignore the timing of S.W.’s interrogation, a factor that has received little attention. According to the detective who interrogated S.W., the police arrested S.W. just after the incident at 10:20 a.m., and conducted a show-up identification soon after. But, as the video recording of the interview reflects, the detective read S.W. his rights at 11:54 p.m. Thus S.W. was in custody for over twelve hours before being interrogated,[18] and his exhaustion is evident in the video: when he enters the room, he immediately puts his head on his knees, as if to go to sleep.
The unexplained twelve-hour wait between arrest and interview, S.W.’s age and particular cognitive issues, and the confusing, misleading, and coercive Miranda warnings S.W. received before he waived his rights amply support the majority opinion’s conclusion that S.W.’s waiver was not voluntary.[19] Thus, I have no reserva *113 tions about the court’s conclusion that S.W.’s waiver of his Miranda rights was invalid.
Nevertheless, I think it is ill-advised for the court to resolve this case on voluntariness grounds for two reasons. First, by upholding the warnings delivered in this case as effective, this court reduces Miranda warnings to a technicality, an incantation with no force or real meaning — a result, I submit, that cannot be squared with the Supreme Court’s decision in Miranda or its progeny. Second and relatedly, the subjective totality-of-the-circumstances analysis on which the majority opinion relies is an imperfect safeguard for the rights the Supreme Court in Miranda sought to protect with clearcut warnings. In other words, although this opinion gives well-deserved relief to S.W., it dismantles the critical protection that Miranda is supposed to extend to all individuals who are in custody and subjected to interrogation. Accordingly, although I concur in the determination that S.W.’s waiver was involuntary and in the judgment of reversal, I dissent from the decision not to resolve this case on the ground that the detective’s Miranda warnings were ineffective. These warnings were both confusing and coercive, and they virtually guaranteed that S.W. would waive the very rights they were meant to protect.

. As the Court explained it:
In this-technique, two agents are employed. Mutt, the relentless investigator, who knows the subject is guilty and is not going to waste any time.... Jeff, on die other hand, is obviously a kindhearted man.... He disapproves of Mutt and his tactics and will arrange to-get him off the case if the subject will cooperate. He can’t hold Mutt off for very long. The subject would be wise to make a quick decision.
Id. at 452, 86 S.Ct. 1602.

. My colleague dissenting from the court’s determination that S.W.’s waiver was involuntarily made seems to lose sight of the Miranda warnings’ essence as a procedural protection; he seems to think our interest is only in ensuring the veracity of any confession obtained. False confessions are a real and serious concern; but the, rationale for Miranda warnings extends well beyond forestalling false confessions. Miranda warnings are grounded in the right against compelled self-incrimination. Miranda, 384 U.S. at 457-58, 465-66, 86 S.Ct. 1602. As the Court in Miranda explained:
[T]he constitutional foundation ... is the respect a government — state or federal— must accord to the dignity and integrity of its citizens. ' To maintain a ‘fair state-individual balance,’ to require the government ‘to shoulder the entire load,’ to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compellirig it from his own mouth.
Id. at 460, 86 S.Ct. 1602 (internal citations omitted). Miranda warnings are also grounded in the recognition that the right to counsel "is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today.” Id. at 469, 86 S.Ct. 1602; see Gideon v. Wainwright, 372 U.S. 335, 343, *107 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (explaining that an individual’s right to the assistance of counsel when subject to a prosecution by the government "is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty” (quoting Johnson v. Zerbst, 304 U.S. 458, 462, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938))).

.See id. at 444, 86 S.Ct. 1602 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.”); id.- at 478-79, 86 S.Ct. 1602 (detailing the warnings that are required "unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored”); id. at 490, 58 S.Ct. 1019 ("Congress and the States are free to develop their own safeguards for the privilege, so long as they are fully as effective as those described above_”).

. See Seibert, 542 U.S. at 610 n. 2, 124 S.Ct. 2601 (detailing other methods).

. Although Seibert was plurality opinion, Justice Kennedy provided a fifth vote for the determination that law enforcement officers do not comply with Miranda if they advise a defendant of -all the rights on the Miranda checklist but communicate those warnings in a way that subverts their purpose. 542 U.S. at 621, 124 S.Ct. 2601 (Kennedy, J., concurring) ("The Miranda rule would be frustrated were we to allow police to undermine its meaning and effect.”).

. See, e.g., Yale Kamisar, Commentary, A Look Back at the "Gatehouses and Mansions” of American Criminal Procedure, 12 Ohio St. J.Crim. L. 645, 654 & n. 41 (2015) ("There is reason to believe that the delivery of the Miranda warnings is sometimes, perhaps even routinely, undermined by police interrogators who ... inform suspects at the outset that they will not be able to tell the police ‘their side of the story’ unless they first waive their rights.”); Charles D. Weisselberg, Mourning Miranda, 96 Calif. L.Rev. 1519, 1557-61 (2008) (reviewing the use of "softening up” tactics designed to de-emphasize the significance of the Miranda warnings and increase the likelihood of waiver).

. Other courts have similarly rejected Miranda warnings that obscure the meaning of *109 the rights the warnings are meant to protect. See, e.g., Hart v. Att'y Gen. of State of Fla., 323 F.3d 884, 894 (11th Cir.2003) (clarity of Miranda warnings compromised where police told defendant both that incriminating statements could be used against him and, inconsistently, that "honesty will not hurt you”); United States v. San Juan-Cruz, 314 F.3d 384, 387 (9th Cir.2002) (" 'What Miranda requires is meaningful advice to the unlettered and unlearned in language which they can comprehend and on which they can knowingly act.’ In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading. The warning must be clear and not susceptible to equivocation.” (quoting United States v. Connell, 869 F.2d 1349, 1351 (9th Cir.1989))).

. Cf. Lee v. State, 418 Md. 136, 12 A.3d 1238, 1245-46 (2011) (holding that police officer’s statement to defendant mid-interrogation, "[t]his is between you and me, bud. Only me and you are here, all right?” negated prior waiver of Miranda rights).

. As discussed below, I agree with the determination in Part II.B.2 of the court’s opinion that these coercive statements rendered S.W.'s eventual waiver of his rights involuntary. But the detective’s coercive statements also — first—undermined the effectiveness of the warning itself.

. While Justice Kennedy agreed with the Sei-bert plurality that Miranda warnings may not be delivered in a manner that vitiates their effectiveness, he was of the view that whether the police violated Miranda additionally turned on whether the interrogating officer deliberately subverted the warnings. 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, X, concurring). There can be no doubt that deliberate subversion is evident on the facts presented here. See Hill v. United States, 858 A.2d 435, 444 (D.C.2004) (inferring from the circumstances the "designed nature” of police officer’s tactics violating Miranda).

. Miranda only limits the use of an interviewee’s statements “against the individual in court.” Miranda, 384 U.S. at 469, 86 S.Ct. 1602 (emphasis added).

. My colleagues minimize the detective’s statements in this case by characterizing them as "embellishments." But the statements the detective made before reading the rights card did not "embellish" S.W.’s rights, i.e., make them more attractive; instead, the detective made these rights seem unhelpful, even hurtful to S.W.

.My colleagues warn that there is no “per se rule that invalidates any Miranda warning as a matter of law if that warning is accompanied by statements inconsistent with Miranda." Opinion of Blackbume-Rigsby, J., at 96 n. 8. But if anyone is in danger of announcing a per se rule, it is they. The majority embraces a "perspective of appellant” (i.e., the interviewee) test to assess the effectiveness of the warnings. Id. at 98. But the effectiveness of Miranda warnings is supposed to be assessed objectively. See Seibert, 542 U.S. at 611-13, 124 S.Ct. 2601. Meanwhile, "asking whether, based on the totality of the circumstances, the pre-Miranda remarks and the subsequent Miranda warning permitted appellant to knowingly, intelligently, and voluntarily waive his Miranda rights,” Opinion of Blackburne-Rigsby, X, at 98, is nothing more than an inquiry into the validity of the waiver. Thus, aside from taking notice of the fact that Detective Howland read S.W. the rights card, the majority’s “effectiveness” analysis collapses into a voluntariness test— thereby creating a rule that deems warnings per se effective so long as the rights card is read.

. My dissenting colleague on this issue expresses concern that we are giving insufficient deference to the trial court’s findings of fact. See dissenting opinion of Epstein, J., at Part III.A. Preliminarily, it is important to distinguish factual findings that relate to the voluntariness of S.W.'s statements (e.g., which interview questions he answered). The concern of the majority opinion is the voluntariness of the waiver. On this subject, the trial court actually made very few factual findings, because the basic facts with respect to how the warnings were delivered and how S.W. waived were not controverted. They were captured on a video recording which was admitted into evidence at trial. That recording is now part of the record on appeal and nothing bars us from considering it. See Hood v. United States, 28 A.3d 553, 564 (D.C. 2011) (“We defer to the trial court's reasonable determination of disputed facts.” (emphasis added)); see also, e.g., Turner v. United States, 116 A.3d 894, 936 (D.C.2015) (examining whether there was evidence of "coercion or lack of voluntariness on the videotape” of appellant’s interrogation by police).
In the absence of any factual disputes, whether S.W.'s waiver was constitutionally valid is a pure question of law. We owe no deference to the trial court in conducting our analysis; rather, we review this constitutional claim de novo. Castellon v. United States, 864 A.2d 141, 158 (D.C.2004) ("This court applies a de novo standard of review to the legal determination regarding voluntariness .... ” (quoting United States v. Turner, 761- A.2d 845, 853 (D.C.2000))); Inre M.A.C., 761 A.2d 32, 38 (D.C.2000).

.In light of studies further documenting juveniles' vulnerabilities in interrogation situations, the American Psychological Association has called for reforms in interrogation procedures, see American Psychological Association, Council of Representatives, Resolution on Interrogations of Criminal Suspects (August 2014), available at http://www.apa.org/about/ policy/interrogations.aspx, and the International Association of Chiefs of Police has developed a new training program in conjunction with the United States Office of Juvenile Justice and Delinquency Prevention that "instructs officers to explain Miranda warnings in language teenagers will understand and not to make false promises of leniency, because of youth’s proclivity toward gullibility,” Jan Hoffman, In Interrogations, Teenagers Are Too Young to Know Better, N.Y. Times: Well (October 13, 2014), http://well.blogs.nytimes. com/2014/10/13/in-interrogations-teenagers-are-too-young-to-know-better/. See also Barry C. Feld, Juveniles’ Competence to Exercise Miranda Rights: An Empirical Study of Policy and Practice, 91 Minn. L.Rev. 26, 57-58 (2006) ("Juveniles' lesser understanding of rights and appreciation of legal consequences enhances their vulnerability to interrogation tactics .... Youths' waiver decisions reflect a greater tendency than adults to comply with authority figures and to acquiesce to police officials. Interrogation techniques designed for adults may prove especially problematic when deployed against young suspects.”); id. at 48 (“To summarize, developmental psychological research assessing several domains of legal and adjudicative competence consistently indicates that adolescents as a class are at a significant disadvantage in the interrogation room ... compared with adults. For youths fifteen years of age and younger, these disabilities emerge clearly in the research.”).

. Although the trial court found that S.W. did not have immediate mental health concerns and "seemed lucid,” his competence was not the question. Rather, the question was the validity of his waiver. As to that legal question, as explained above, see supra note 15, we do not defer to the trial court and we undoubtedly may consider S.W.’s youth, cognitive issues, and general mental health.

. The record is silent as to what the police did with S.W. for those twelve hours, but this evidentiary deficit counts against the government, as it is the government's burden to prove that S.W.’s waiver was voluntary. Dorsey, 60 A.3d at 1177; Di Giovanni v. United States, 810 A.2d 887, 892 (D.C.2002) (citing In re M.A.C., 761 A.2d at 36).

. I would not reach the question whether S.W.’s waiver was knowing or intelligent, but I think it is far from clear that it was.