# District of Columbia
# Court of Appeals

**No. 15-CM-413**

MARIO GIOVANI VALENZUELA-CASTILLO,,

Appellant,



FILED
March 8, 2018
DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CMD-1050-15**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia

Before THOMPSON and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the trial court's judgment is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: March 8, 2018.

Opinion by Senior Judge Michael W. Farrell.

Dissenting opinion by Associate Judge Catharine Easterly.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CM-413

MARIO GIOVANI VALENZUELA-CASTILLO, APPELLANT,

v.

UNITED STATES, APPELLEE.

03/08/2018

FILED
District of Columbia
Court of Appeals

*Julio Castillo*
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CMD-1050-15)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued June 16, 2016                                    Decided March 8, 2018)

*Karl R. Tetzlaff* for appellant.

*Monica P. Dolin*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Natasha Smalky*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court by *Senior Judge* FARRELL.

Dissenting opinion by *Associate Judge* EASTERLY at page 12.

FARRELL, *Senior Judge*: Following a bench trial, appellant was found guilty

of attempted voyeurism, in violation of D.C. Code §§ 22-3531 (b)(1), -1803 (2013 Repl.). On appeal, he contends that as a matter of law his conduct did not satisfy the requirements of the voyeurism statute because he did not "occupy a hidden observation post." We disagree and affirm.

## I.

## The Facts

Viewed in the light most favorable to the verdict, the evidence established that shortly after midnight on January 6, 2015, Shirley Cartwright and her niece visited Epicurean and Company, a restaurant on the campus of the Georgetown University Medical Center. The restaurant was not busy; only four employees (two cashiers, appellant, and a supervisor) and about five customers were on the premises, besides Ms. Cartwright and her niece. After paying for her food, Ms. Cartwright asked a cashier for directions to the rest room. The cashier guided her to a hallway and pointed out the ladies' rest room at the end of the hall on the left. As Cartwright passed the door to the men's rest room, appellant was leaving the room with a dustpan and a broom. Cartwright heard appellant speak briefly with

the cashier who had given Cartwright directions. A still-image taken from a hallway video surveillance camera showed appellant looking back at Cartwright just before she entered the ladies' rest room.

Cartwright went into the rest room, which was unoccupied, and entered the last stall. The stalls were separated from each other by floor-to-ceiling walls, and the stall doors extended nearly to the floor, leaving a space of 12 to 14 inches at the bottom. Cartwright did not hear anyone knock or make other noises. While sitting on the toilet, she "got this really eerie feeling . . . and felt really weird and crazy." She looked down and saw "this man down, way down to the ground looking under my stall." The man's face was sideways, but she could not see the rest of his body; judging from the position of his head, Cartwright believed that his body was "down on the ground." Appellant was looking directly at her. Cartwright screamed and cursed at appellant, telling him to get out. Appellant said nothing, got up, and ran out of the rest room. Cartwright recognized him in the bathroom, and testified accordingly, as the restaurant employee she had seen in the hallway.

Appellant testified that he had entered the ladies' room and remained there only to clean it, thinking it was vacant. Noticing that the door to the third stall was

closed, he looked underneath it and was surprised to see Cartwright in the stall. On cross-examination, he was shown surveillance footage from the hallway in which he is seen approaching the door to the ladies' room about thirty seconds after Cartwright entered it. Appellant acknowledged that he turned back before entering, walked to the men's room, looked briefly inside, and then returned to the ladies' room and entered it.

In finding appellant guilty, the trial court credited Cartwright's testimony and found that appellant had entered the ladies' room "quietly and surreptitiously," hid himself as well as he could to observe Cartwright, and left only when he was discovered.

## II.

### Discussion

Whether appellant's charged conduct met the statutory requirements for voyeurism is a question of law this court decides *de novo*. *See Brown v. United States*, 97 A.3d 92, 95 (D.C. 2014).

Introduced as the "Privacy Protection Act of 2005" and enacted in 2007 as part of the "Omnibus Public Safety Amendment Act," the voyeurism statute prohibits acts of voyeurism accompanied by surreptitious filming or recording, and also, in part, makes it unlawful for a person "to occupy a hidden observation post . . . for the purpose of secretly or surreptitiously observing an individual who is . . . [u]sing a bathroom or rest room . . . ." § 22-3531 (b)(1). The statute does not define the term "hidden observation post," which was added to the legislation during the markup process.

Appellant argues that, however the term is defined, he could not as a matter of law "occupy a hidden observation post when at the time [alleged he was] not in hiding, but in plain view of the alleged victim." The argument appears to be that without proof that his presence was unknown to the victim for some discernible time before she saw him and screamed, he could not have been "hidden" while observing her. Appellant's broader argument is that "a public rest room is," by definition, "not a hidden observation post," at least without the use of a "peephole,

mirror or electronic device for the purpose of observing someone,"[1] because anyone "st[anding] in the middle of a public rest room" is "in plain and clear view of anyone else in [the] rest room's common area."

Neither of these arguments is persuasive. Appellant did not merely "st[and] in the middle of a public rest room," and the judge, as trier of fact, could fairly conclude that appellant staged his behavior so as to maximize the likelihood that he would be able to observe Cartwright in the stall while unseen. Specifically, according to evidence the judge credited, appellant first checked to see that no one was near the rest room, then silently entered it, dropped to the ground, and positioned his head sideways near the floor to look under the door in a way calculated to not draw attention. He thus occupied a "hidden observation post" by any common-sense understanding of the phrase.

Black's Law Dictionary, although with military usage predominantly in mind, defines an "observation post" as "a position from which an enemy or potential enemy can be watched." *Observation Post*, BLACK'S LAW DICTIONARY

---

[1] Section 3531 (b) likewise makes it a crime to "install or maintain a peephole, mirror, or any electronic device" for the purpose of secret observation.

(10th ed. 2014); *see Hood v. United States*, 28 A.3d 553, 559-60 (D.C. 2011) (where a statute does not define a term at issue, courts look to the "ordinary or common" meaning, for which "we may look to the dictionary."[2] Thus, an "observation post" need only be a "position," rather than a fixed or enclosed structure or site, from which an observer can watch the activity of others. Appellant's position on the floor qualified as one because, as the trial judge fairly concluded, he occupied it for the purpose of observing Cartwright.

Appellant's observation post was also "hidden" from Cartwright, if only briefly. The evidence showed that he was and intended himself to be concealed from her and others, because (1), according to the video surveillance from the hallway, he checked his surroundings before entering the rest room, (2) the door to the rest room closed behind him, (3) the rest room was located at the end of a hallway at some distance from the restaurant's food-service area, and (4) the restaurant had few customers after midnight. Further, he entered the rest room quietly without knocking or announcing his entry and remained still as he lowered his body and head far enough to the ground to see Cartwright. The fact that he was

---

[2] *See also West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718, 726, 727 (D.C. 1994) ("[I]f a word that should be defined in a statute is not, then its commonly accepted meaning is applied.").

hidden from her just momentarily has no bearing, otherwise the statute would excuse clumsy efforts at concealment and punish only more artful ones (such as peering over the top of the dividing panel from an adjoining stall, confident that a seated victim will feel no need to look above her head).

Applying the statute to make appellant's conduct unlawful is consistent with its legislative aim, which is to "prohibit persons from spying on their neighbors, guests, tenants, or others in places and under circumstances where there is an expectation of privacy, that is, in a home, bedroom, bathroom, changing room, and similar locations and under one's clothing." Letter from Anthony A. Williams, Mayor, District of Columbia, to Linda W. Cropp, D.C. Council Chairman, introducing the legislation (Apr. 6, 2005), 8 (http://lims.dccouncil.us/Download/15575/B16-0247-CommitteeReport1.pdf at 36)). There is no evidence that the D.C. Council, in enacting the "Privacy Protection Act of 2005" and adding the phrase "hidden observation post," intended to outlaw the surreptitious use of, say, bathroom peepholes and mirrors but to permit acts of voyeurism in staged circumstances such as this case presents. The

effect on the victim is the same, and the conduct equally offensive.[3]

Appellant further errs in arguing that if the common area of a rest room may serve as a post within the statute's meaning, then "nearly all public areas" would qualify as hidden observation posts. As explained, what made appellant's position a hidden observation post were the circumstances making his vantage point private, not public. After midnight when there were few restaurant patrons, he stealthily entered the ladies' room and closed the door behind him, then, having reason to believe he was hidden from others and Cartwright, positioned himself so as to spy on her while she used the facility. This conduct, designed to enable appellant to observe the victim while himself unseen, met the statutory requirement that he occupy a hidden observation post.

The dissent asserts that appellant engaged in no more than "simple viewing" unreached by the statute, *post* at 13-14, which it says prohibits only "the use of

---

[3] There are limits, of course, to the reach of the statute. A person, uncertain whether anyone was occupying a bathroom stall behind its closed door, who looks under the door to eliminate the uncertainty would not have satisfied the "purpose[fulness]" element of the statute. The same would be true if the person opened an (unlocked) door of the stall to check occupancy. For the reasons stated, appellant's defense at trial along these lines was properly rejected by the trial judge.

special techniques and devices for surveillance and recording," *id*. at 20, those suited to "allow[ing] a user to evade detection and cause greater (and in the case of recording) more lasting harm." *Id*. Besides thereby slighting (as transitory and not "lasting") the degradation Cartwright felt in being spied on only briefly, the dissent effectively collapses the statutory act of "occupy[ing] a hidden observation post" into its companion forbidden acts of "install[ing] or maintain[ing] a peephole, mirror, or any electronic device" for the same illicit purpose.[4] But the Council did not limit itself to punishing the use of "specialized surveillance devices and techniques" to spy, perhaps because it saw the impossibility, under a law meant to enhance privacy in public bathrooms (among other spaces), to explain to someone in Cartwright's place why the statute would shield them against surveillance by "artful" devices but not against less sophisticated yet equally degrading forms of spying such as appellant carried out. Likewise, if the Council were unconcerned with brief or furtive acts of spying, requiring the voyeur instead to maintain the advantageous post "for more than a transitory period of time," *post* at 23, one

---

[4] The dissent gives itself a crutch by including "techniques" (not just "devices") in its description of the forbidden conduct, but does not explain why appellant's stratagem, with its accompanying precautions, was not a "technique" – unless, for the dissent, it must have been designed more "artful[ly]," *post* at 13, 20, so as to produce "greater . . . and more lasting harm" to the victim than what Cartwright endured.

would expect it to have said so, assuming it thought courts could meaningfully tell when transitory becomes nontransitory. (Suppose, for example, a bathroom stall occupant is absorbed in her cellphone contents until suddenly realizing she is being -- and has been -- peered at from over the top of the stall divider or from under her stall door. Transitory or intransitory?)

The dissent's additional argument that when appellant spied on the victim, however briefly, "he was not hidden from anyone who might enter the rest room," *post* at 24, ignores the precautions he took to avoid just such discovery. And likewise, the assertion that he "was [not] hidden from Ms. Cartwright[] when she looked down in his direction," *id.* at 24-25, merely repeats the dissent's view that clumsy acts of spying not likely to buy the voyeur more than short-lived gratification are unreached by the statute.

In short, appellant did not just "engage[] in simple viewing," *post* at 13-14, as though seated on a park bench viewing passersby, but employed his own artifice and precautions to observe, unseen, a person whose privacy the statute is expressly meant to protect. Moreover, by any reckoning, he attempted to practice such voyeurism, which is what the charging document alleged.

12

*Affirmed.*

EASTERLY, *Associate Judge*, dissenting:  Peering at another person under a bathroom stall door and watching while that person sits on a toilet is clearly creepy and an invasion of that person's privacy.  A legislature could decide that it should be a crime to act in such a manner.  But if the criminal code is silent, this court cannot fill the gap.

There is no crime in the District of Columbia Code that prohibits the simple act of viewing another person in a manner that violates that person's privacy.  Our disorderly conduct statute used to broadly (but vaguely) prohibit "breaches of the peace," including all manner of invasive viewing.  But as recently amended, its prohibition on invasive viewing is limited:  it only makes it "unlawful for a person to stealthily look into a window or other opening of a dwelling . . . under circumstances in which an occupant would have a reasonable expectation of privacy."  D.C. Code § 22-1321 (f) (2013 Repl.).

The voyeurism statute, D.C. Code § 22-3531 (2013 Repl.), extends beyond

dwellings; but it does not address the act of viewing itself. Enacted before the disorderly conduct statute was amended and narrowed, the voyeurism statute is focused on other conduct: it prohibits the use of an array of special techniques and devices for the purpose of secretly viewing another person; in pertinent part in this case, it makes it "unlawful for any person *to occupy a hidden observation post* or *to install or maintain a peephole, mirror, or any electronic device* for the purpose of secretly or surreptitiously observing an individual who is: . . . [u]sing a bathroom or rest room." D.C. Code § 22-3531 (b)(1) (emphasis added). Beyond its plain text, the legislative history of the voyeurism statute makes clear that the new crimes it defines were, in fact, meant to "punish only more artful" means of secret viewing and recording, *ante* at 8—not simple viewing itself.

Mr. Valenzuela-Castillo employed no special device or technique that would bring his conduct under the voyeurism statute. He did not "install or maintain" a "peephole or mirror or electronic device" to allow him to secretly view persons using the restaurant's rest rooms in violation of D.C. Code § 22-3531 (b)(1). Nor did he "occupy a hidden observation post," *id.*, when he positioned his body in the common area of the women's rest room in such a way that allowed him see the complainant, Ms. Cartwright, underneath the door of a toilet stall but that also

allowed her to see him. At most he engaged in simple viewing. The absence of a statute criminalizing his actions does not give this court license to interpret the voyeurism statute beyond its bounds, even if we believe that we are only extending the statute to "equally offensive" conduct. *Ante* at 9. Mr. Valenzuela-Castillo's conviction for attempted voyeurism should be reversed.[1]

## I. Facts

On an evening in January 2015, while visiting a restaurant on the campus of Georgetown University Medical Center, Ms. Cartwright went to the women's rest room, entered a stall, and, while sitting on the toilet, looked down and saw Mr. Valenzuela-Castillo, the restaurant janitor, looking at her from under the stall door.

As detailed in the majority opinion, Ms. Cartwright testified that she saw Mr. Valenzuela-Castillo just before she entered the women's rest room, and video footage indicated that he saw her. When Ms. Cartwright walked into the women's

---

[1] On appeal, as at trial, the government's theory is that Mr. Valenzuela-Castillo committed the completed crime of voyeurism even though he was charged with and convicted of attempt. In my view, the evidence is equally insufficient to permit a reasonable fact-finder to conclude that Mr. Valenzuela-Castillo attempted "to occupy a hidden observation post."

room, no one else was there. "It was a pretty huge bathroom," with a row of six or seven toilet stalls on one side and sinks on the other side. The stalls were separated from each other by floor to ceiling walls and the doors, which closed fully with a knob (not a latch), left only an opening of twelve to fourteen inches at the bottom. Ms. Cartwright entered a stall. She did not hear anyone else enter the rest room. She estimated that she had been in the rest room for three to four minutes when she looked down and saw Mr. Valenzuela-Castillo looking under her stall door. "The front side of his face" was visible; he was "staring" at her; and they made eye contact. She could not see his body, but his face was positioned sideways, from which she deduced that he was "down on the ground." After she screamed, "he got up and ran out."

Mr. Valenzuela-Castillo testified through an interpreter that he had entered the women's rest room to clean it, thinking it was vacant. He had seen Ms. Cartwright go into the women's rest room earlier, but he had not noticed that she had not walked out. He cleaned the other stalls before reaching Ms. Cartwright's stall. Noticing that the door was closed, he "looked under it to see if there was anybody there." He "bent down" and "saw [only] her shoes." Ms. Cartwright "said something in English right away." Mr. Valenzuela-Castillo apologized and

told her he was just cleaning. As documented in the surveillance video, he then "walked out normally" and "kept working." He admitted that he had already been in the women's rest room earlier, but he testified that he had only checked the toilet paper and had not cleaned the rest room at that time.

The trial court credited Ms. Cartwright, discredited Mr. Valenzuela-Castillo, and found Mr. Valenzuela-Castillo guilty of attempted voyeurism. There was no evidence that Mr. Valenzuela-Castillo had "install[ed] or maintain[ed] a peephole, mirror, or any electronic device," in violation of the statute. D.C. Code § 22-3531 (b). Thus the court seemed to determine that Mr. Valenzuela-Castillo had "occup[ied] a hidden observation post," *id.* although she did not reference the statutory language in her brief ruling. After making credibility findings, all the trial court said was:

> I do find that his actions were secretive. I do find that he went in quietly and surreptitiously. That the only way he could see into the stall was the way that he did it. That's the only way he could be secretive in that particular location. That he was in fact hiding himself as best he could, and that he only left when discovered. So that's my ruling.

## II. Analysis

As the majority opinion acknowledges, whether Mr. Valenzuela-Castillo's charged conduct is punishable under D.C. Code § 22-3531 (b), a subsection of the voyeurism statute, is a question of statutory interpretation that this court decides de novo. *Hernandez v. Banks*, 84 A.3d 543, 552 (D.C. 2014).

The analysis of a statute ordinarily begins with a careful examination of its text, *see Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc). But in this case it is critical at the outset to put the voyeurism statute in historical context. *See Edwards v. Aguillard*, 482 U.S. 578, 595 (1987) (acknowledging that it may be important to consider "the historical context of the statute, . . . and the specific sequence of events leading to passage of the statute."). The majority opinion acknowledges that voyeurism is a relatively new crime in the District of Columbia. But it says nothing about the legislative landscape at the time this law was enacted in 2007. As a result, its textual analysis is infused with the assumption that the voyeurism statute was drafted as a comprehensive measure to criminalize a wide range of behavior previously unaddressed by the criminal law, including simple viewing of another person in a

manner that violates that person's privacy.  *See, e.g.*, *ante* at 8 (reasoning that the Council, in passing the voyeurism statute, could not have "intended to outlaw the surreptitious use of, say, bathroom peepholes and mirrors but to permit acts of voyeurism in staged circumstances such as this case presents").

The foundational premise of the majority opinion is incorrect.  At the time the voyeurism statute became law, the act of viewing another person in a manner that invades that person's privacy, also known as "peeping Tom" conduct, was already a crime and had long been prosecuted under the disorderly conduct statute.[2]  Because invasive viewing was already illegal in the District, the

---

[2]  D.C. Code § 22-1321 (1994) ("Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby . . . acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others . . . shall be fined not more than $250 or imprisoned not more than 90 days, or both."); *see, e.g.*, *District of Columbia v. Jordan*, 232 A.2d 298, 299 (D.C. 1967) (concluding that allegations of peeping Tom behavior constitutes a breach of the peace under the disorderly conduct statute); *Carey v. District of Columbia*, 102 A.2d 314, 315 (D.C. 1954) (defendant "standing on the lawn" and looking into the window of a lit apartment properly convicted of disorderly conduct); *see also Public Hearing on B-16-247 the Omnibus Public Safety Act of 2005 Before the Comm. on the Judiciary* (May 31, 2005) (testimony of Robert J. Spagnoletti, Attorney General) (in testimony in favor of the voyeurism bill, the Attorney General described a case of upskirting—the practice of secretly filming or taking photographs up another person's skirt—and explained that "[t]he most [the District was] able to charge [the] man with was disorderly conduct," which he characterized as "woefully inadequate under the

(continued…)

voyeurism statute, first introduced as the "Privacy Protection Act of 2005,"[3] was concerned with something other than the simple act of viewing. *See In re Prosecution of Perrow*, 172 A.3d 894, 900 & n.13 (D.C. 2017) (explaining that "voyeurism is not a species of 'Peeping Tom'" offenses prosecuted as disorderly conduct).

The target of the voyeurism statute is manifest from its text, which prohibits three types of conduct distinct from actual viewing.[4] The statute makes it unlawful for a person:

- "*to occupy a hidden observation post* or *to install or maintain a peephole, mirror, or any electronic device* for the purpose of secretly or surreptitiously observing an individual who is: (1) Using a bathroom or rest room; (2) Totally or partially undressed or changing clothes; or (3) Engaging in sexual activity." D.C. Code § 22-3531 (b) (emphasis added);

- "*to electronically record*, without the express and informed consent of the individual being recorded, an individual who is: (1) Using a bathroom or rest room; (2) Totally or partially undressed or changing clothes; or (3) Engaging in sexual activity." D.C. Code § 22-3531 (c) (emphasis added); or

---

(…continued)
circumstances.").

[3] Omnibus Public Safety Amendment Act, 2006 D.C. Sess. Law Serv. 16-306 (West) (effective Apr. 24, 2007).

[4] Exceptions to these prohibitions are carved out in D.C. Code § 22-3531 (e).

- "*to intentionally capture an image* of a private area of an individual, under circumstances in which the individual has a reasonable expectation of privacy, without the individual's express and informed consent." D.C. Code § 22-3531 (d) (emphasis added).

The collective aim of these provisions is to prohibit and punish more severely[5] the use of special techniques and devices for surveillance and recording—techniques and devices that, precisely because they are "more artful" and surreptitious, may allow a user to evade detection and cause greater (and in the case of recording) more lasting harm.[6] The operative statutory text in this case, "to occupy a hidden

---

[5] A defendant convicted of voyeurism is exposed to the maximum penalties authorized for misdemeanor offenses, up to a year of imprisonment and the highest fine (in 2006, $1000; now $2500). *Lopez-Ramirez v. United States*, 171 A.3d 169, 174 (D.C. 2017) (explaining that the 1994 Misdemeanor Streamlining Act set maximum fines for misdemeanors at $1000); D.C. Code § 22-3571.01 (2013 Repl.) (standardizing $1000 as the maximum fine for misdemeanors punishable by imprisonment for 180 days and $2500 as the maximum for misdemeanors punishable by imprisonment between 180 days and a year). This is true whether the defendant "occup[ies] a hidden observation post" or "install[s] or maintain[s]" enumerated tools for surreptitious viewing in violation of subsection (b); electronically records another individual under certain circumstances in violation of subsection (c); or captures certain images in violation of subsection (d). *See* D.C. Code § 22-3531 (f)(1). These penalties are far more severe than the penalties authorized for peeping Tom/disorderly conduct offenses at the time the voyeurism statute was enacted. *See* D.C. Code § 22-1321 (1994) (authorizing incarceration of only up to 90 days in jail and a $250 fine for disorderly conduct).

[6] The majority opinion expresses skepticism that only "more artful" efforts to engage in invasive viewing would be punished by the voyeurism statute while "more clumsy efforts at concealment" are "excuse[d]." *Ante* at 8. But as explained, the majority opinion's analysis is untethered to the historical context of

(continued…)

observation post" must be read in this context. *Washington v. District of Columbia,* 137 A.3d 170, 174 (D.C. 2016) ("[I]t is a fundamental principle of statutory construction (and, indeed, of language itself)" that statutory language should be read in context, and statutes should be read holistically).[7]

The majority opinion not only reads this actus reus provision without regard to its historical context and the statute as a whole, but it also fails to interpret the statutory "words . . . according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores*, 470 A.2d at 753 (internal quotation marks and brackets omitted). In this way, the majority opinion is able to

---

(…continued)
the statute, *see supra*, as well as the plain text, *see infra*, both of which demonstrate that voyeurism punishes the use of special techniques and devices to view or record, not simple viewing. (It is beside the point whether these special techniques and devices are employed clumsily or adeptly.)

[7] *See also In re L.H.*, 634 A.2d 1230, 1231 (D.C. 1993) ("a statutory provision is to be read, whenever possible, in harmony with other provisions to which it naturally relates."); *see, e.g.*, *Yates v. United States*, 135 S. Ct. 1074, 1085–87 (2015) (holding that "tangible object" under the Sarbanes-Oxley Act necessarily meant a "subset of tangible objects involving records and documents" because of the context of the statute, which criminalized the destruction of "any record, document, or tangible object"); *Beitzell v. District of Columbia*, 21 App. D.C. 49, 60 (D.C. 1903) (looking to other statutory provisions, which only governed commerce locally, to conclude that the particular provision had a "purely municipal character" too).

conclude that "to occupy a hidden observation post" means nothing more than to assume a bodily position from which one can view another person, *ante* at 7, conveniently replicating the facts of this case.

The majority opinion begins its examination of the text with "observation post." Although the dictionary defines "post" as a fixed location or station, and an observation post is readily understood as a station from which one can "observe" what one wishes to see,[8] the majority opinion asserts without citing any authority that an observation post need only be a "position . . . from which an observer can watch the activity of others." *Ante* at 7. By "position," the majority means "a bodily position." *Id.* (asserting that Mr. Valenzuela-Castillo's bodily position— "lower[ing] his body and his head far enough to the ground to see Ms. Cartwright"—"qualified" as an observation post "because . . . he occupied it for the purpose of observing Cartwright").[9] By the majority's reasoning, any space the

_____

[8] *Merriam-Webster's Collegiate Dictionary* 969 (post), 857 (observe) (11th ed. 2014); *see also Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc) (endorsing the use of dictionary definitions to determine the ordinary meaning of words employed in statutes).

[9] The majority opinion implicitly concedes that the entire common area of the rest room was not "an observation post." *Ante* at 6. Such expansive understanding of those words would expose to criminal penalty anyone doing nothing more than standing in the common area of a rest room with multiple toilet

(continued…)

human body fills, from which others can be seen, is an observation post. The majority opinion thus leaches this term of all sensible meaning.

The majority opinion's misconception of "observation post" as nothing more than a bodily position is further apparent when one couples it with the statutory language "to occupy," language the majority opinion ignores entirely. The act of "occupying" in everyday speech is understood as filling up an externally defined space for more than a transitory period of time.[10] *Merriam-Webster's Collegiate Dictionary* 858 (11th ed. 2014) ("to take up (a place or extent in space) . . . fill (an extent in time)"). As I wrote this dissent, I occupied my office and, within my office, my desk chair. But no one would say I "occupied" a sitting position. Within the voyeurism statute, "to occupy a hidden observation post" must be understood as requiring a defendant to deliberately place his person in a specific, advantageous location—not simply to assume a bodily position.

---

(…continued)

stalls. Moreover, it cannot be squared with the requirement that an "observation post" allow for observation. While standing in the common area Mr. Valenzuela-Castillo could not see into Ms. Cartwright's stall. It was only after he lowered his body to look under the stall door that he was able to view inside the toilet stall.

[10] The temporal component is not in dispute; the government acknowledged at oral argument that "to occupy an observation post" must allow for "more than a fleeting or opportunistic glance."

Having defined an observation post as nothing more than a bodily position and ignored the "to occupy" requirement, the majority opinion then downgrades what it means to be "hidden." The majority acknowledges that the word "hidden" is commonly understood as being "concealed." *Id.* at 585. But like the trial court, it then conflates "a hidden observation post" with Mr. Valenzuela-Castillo's alleged attempts to be "secretive."[11] The majority opinion highlights Mr. Valenzuela-Castillo's apparent effort to enter the women's rest room without being seen or heard. But the question is not whether he successfully entered the rest room without attracting attention. Having defined the "observation post" as Mr. Valenzuela-Castillo's bodily position, the majority must examine whether this position was "hidden," i.e. "concealed." Certainly when Mr. Valenzuela-Castillo was either bent down, or lying on the floor of the common area of the rest room in front of Ms. Cartwright's stall, he was not hidden from anyone who might enter the rest room. Nor was he hidden from Ms. Cartwright; when she looked down in his

---

[11] Without referencing the statutory text, the trial court determined that Mr. Valenzuela-Castillo was guilty of § 22-3531 (b), because "his actions were secretive." Acknowledging that the rest room was an open, common area, the trial judge stated "[t]hat the only way he could see into the stall was the way that he did it. *That's the only way he could be secretive in that particular location*. That he was in fact hiding himself as best he could."

direction, she saw him. But the majority determines that Mr. Valenzuela-Castillo was hidden at least until Ms. Cartwright perceived him. Or in the government's words at oral argument, he was "hidden" "before he [was] caught." This is not what "hidden" means.

In short, the majority opinion interprets "to occupy a hidden observation post" to encompass the simple act of viewing. But it does so by disregarding a third of the statutory language and broadly interpreting the remainder to the point of distortion. This is neither a proper nor defensible plain language interpretation of this actus reus provision.[12]

Indeed, the majority opinion's interpretation of "occupy[ing] a hidden observation post" is so broad that it encompasses the commonplace practice of looking under stall doors for ankles to determine whether a stall is occupied. The

---

[12] Because I think the plain text of the statute clearly does not encompass Mr. Valenzuela-Castillo's conduct, I see no need in this case to define with greater precision what would constitute "occupy[ing] a hidden observation post." That said, far from "collaps[ing]" this separate actus reus into "its companion forbidden acts of "install[ing] or maintain[ing] a peephole, mirror, or any electronic device," *ante* at 10, I think this actus reus must be given distinct, sensible meaning grounded in its text. At a minimum, it would seem to require the defendant to station himself for a nontransitory period of time in a "hidden" location, i.e., a location where he could see but not be seen.

majority opinion acknowledges the danger of its interpretation, *ante* at 9, note 3, but reassures the reader that a person conducting a legitimate occupancy check would not have the requisite "purposeful" mens rea. This is small comfort, however, as a defendant's mens rea is seldom declared and almost always inferred from her actions. [13] *Gray v. United States*, 585 A.2d 164, 165 (D.C. 1991) ("Intent can rarely be proved directly, and must often be discerned from the surrounding circumstances."); *see, e.g.*, *Graure v. United States*, 18 A.3d 743, 759–60 (D.C. 2011) (concluding that a jury could infer intent from defendant's actions).

Notwithstanding this acknowledged danger of criminalizing innocent conduct, the majority opinion asserts that its interpretation of § 22-3531 (b) is "consistent with [the voyeurism statute's] legislative aim," as evidenced by its legislative history. *Ante* at 8. As a preliminary matter, legislative history cannot trump a statute's plain text. *See Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011) ("The primacy of the statutory text means that resort to legislative history to

---

[13] The government's representation at oral argument that it would refrain from prosecuting innocent occupancy checks is similarly unhelpful because what is innocent will depend on the government's inferences regarding the defendant's mens rea. In any event, "we cannot construe a criminal statute on the assumption that the Government will use it responsibly." *McDonnell v. United States*, 136 S. Ct. 2355, 2372–73 (2016) (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

construe a statute is generally unnecessary. . . .”). Moreover, the legislative history, such as it is, does not support the majority opinion's determination that the voyeurism statute meant to prohibit simple viewing.

The legislative history of the particular phrase, "to occupy a hidden observation post," is sparse because this language was neither in the initial bill, the "Video Voyeurism Act of 2005," B 816-0246, nor the Committee print. Instead it made its first appearance in the legislation during the markup process. The majority opinion quotes from a letter from the Mayor, appended to the Committee Report, seemingly to suggest that the voyeurism statute was meant to broadly prohibit certain types of "spying." *Ante* at 8. But since "to occupy a hidden observation post" was not yet in the bill, the spying to which the mayor was referring could only have been the use of special devices to observe and to record. The testimony of the Mayor's then-appointed Attorney General in favor of the committee print version of the legislation leaves no doubt that the use of such special devices was the central concern of the proponents of the legislation. The Attorney General explained that

> [i]n this world of changing technology, prosecutors in the District and elsewhere find themselves challenged in applying old laws to new circumstances. Cellular phones

with cameras, button size video cameras, the Internet, and a host of other technological advances have made it easier to invade someone's privacy and increasingly difficult to prevent such invasions.[14]

The Attorney General informed the Council that eight states, including the District's immediate neighbors, Virginia and Maryland, had "enacted laws that prohibit the filming or other recording of anyone in areas where a person has a reasonable expectation of privacy." And he stated that the proposed legislation was "designed to fill a void" in the law and to "bring our jurisdiction in line with other states."[15] *See In re M.M.D.*, 662 A.2d 837, 851 (D.C. 1995) ("Courts [must] scrutinize . . . legislative history with a view to finding out what the legislature actually intended at the time of enactment.").

Even after the "occupy[ing] a hidden observation post" language was added and the bill became law, the understanding that the voyeurism statute was intended

---

[14]  As an example of a case where the law had not kept up with technology, the Attorney General focused on "upskirting" which could only be prosecuted as disorderly conduct. *Supra* note 3.

[15]  Given that "the voyeurism title was the result of extensive collaboration" between his office "the Office of the United States Attorney and the Metropolitan Police Department," the Attorney General appeared to express the views of the law enforcement community generally.

to criminalize specialized surveillance devices and techniques—not simple viewing—persisted. Thus, in the testimony submitted by the United States Attorney's Office regarding the 2011 amendments to the disorderly conduct statute, the United States Attorney's Special Counsel explained, "the 'voyeurism' statute . . . was not meant to replace the disorderly conduct statute with respect to 'peeping toms.' Were it to do so, it would have to be revised." *See* D.C. Council, Report on Bill 18-425 at 64 n.1 (Nov. 19, 2010). The Council for Court Excellence (CCE) working group that spearheaded the revision to the disorderly conduct statute similarly acknowledged that the voyeurism statute does not criminalize any form of actual viewing, and it recommended (unsuccessfully) that the voyeurism statute be amended to "prohibit secretly 'viewing' the private area of another individual."[16]

The legislative history of the voyeurism statute thus provides no support for the majority opinion's determination that "to occupy a hidden observation post"

---

[16] The CCE proposed an amendment to § 22-3531 (d)—the subsection that makes it "unlawful for a person to intentionally capture an image of a private area of an individual, under circumstances in which the individual has a reasonable expectation of privacy, without the individual's express and informed consent"— not subsection (b). This further supports the general understanding that subsection (b) was exclusively meant to criminalize the use of surveillance devices and techniques.

was meant to encompass simple viewing, conduct that was already punishable as disorderly conduct. But a review of the Council's subsequent legislative actions does illuminate the reason Mr. Valenzuela-Castillo, in 2015, was prosecuted for voyeurism, and perhaps the reason the majority opinion is willing to affirm his conviction.

In 2011, four years after the passage of the voyeurism statute, the disorderly conduct statute was overhauled to address longstanding concerns about its vagueness. Disorderly Conduct Amendment Act, 2009 D.C. Sess. Law Serv. 18-375 (West). The end result substantially restricted the statute's scope vis à vis invasive viewing. Specifically, the statute now only makes it unlawful "to stealthily look into a window or other opening of a dwelling." D.C. Code §§ 22-1321 (f), 6-101.07 (4). The statute has no application to invasive viewing into or within non-residential buildings.

Unable to prosecute Mr. Valenzuela-Castillo for disorderly conduct as it might have done before 2011, the government in this case charged Mr. Valenzuela-Castillo with voyeurism. The government invites us to expansively interpret the earlier drafted voyeurism statute to fill a gap the Council created when it later

amended the disorderly conduct statute. We should decline the invitation. We cannot read the legislative mind. We cannot say with any certainty that the creation of this gap was unintentional. And it is most definitely not our job to make the policy decision that certain conduct omitted from the voyeurism statute is "equally offensive" as conduct prohibited by the statute's plain language, *ante* at 9, and, on that basis alone, to reinterpret the plain language to encompass the omitted conduct.[17]

Because I think the majority opinion both misinterprets what it means "to occupy a hidden observation post" and exceeds our judicial role, I respectfully dissent.

---

[17] Even if there were some legitimate question whether Mr. Valenzuela-Castillo's conduct amounted to "occupy[ing] a hidden observation post," it would still be inappropriate for this court to uphold his conviction under D.C. Code § 22-3531 (b). In such a circumstance, we would have to "strictly construe" the voyeurism statute and resolve ambiguities in favor of Mr. Valenzuela, i.e. impose "the Rule of Lenity." *Whitfield v. United States*, 99 A.3d 650, 656 (D.C. 2014); *see also Ruffin v. United States*, 76 A.3d 845, 858 (D.C. 2013) (acknowledging that "when a choice has to be made between two readings of what conduct [the legislature] has made a crime," this court should not choose the "harsher alternative" but instead should require the legislature to speak in language that is "clear and definite").